# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

PATSY TAVAREZ,

    Plaintiff,

v.　　　　　　　　　　　　　　　　　　　　　　　NO. 11-CV-673 WJ/ACT

UNITED BLOOD SERVICES,

    Defendant.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

THIS MATTER comes before the Court on Defendant United Blood Services' ("UBS") Motion for Summary Judgement (**doc. 40**), filed April 18, 2012, and on Plaintiff Patsy Tavarez's Motion for Partial Summary Judgment as to Liability (**doc. 49**), filed May 11, 2012.  For the reasons stated herein, Defendant's motion shall be **GRANTED** and Plaintiff's motion shall be **DENIED**.

Because the matters are related, the Court also considers Defendant's Motion to Exclude the Testimony of Mary T. Cooley (**doc. 36**), filed April 17, 2012, and Plaintiff's Motion to Exclude Testimony of Defendant's Proposed Expert Merl Miller (**doc. 46**), filed May 4, 2012.  Both motions are hereby **DENIED**, and the Court will consider the testimony of both Ms. Cooley and Mr. Miller for purposes of resolving the current cross-motions for summary judgment.

## BACKGROUND

**I.   Procedural Background**

Plaintiff filed her Complaint in the Second Judicial District Court, Bernalillo County,

New Mexico, on July 12, 2011.  Defendant removed the case to this Court pursuant to 28 U.S.C. § 1331 on August 2, 2011.  Plaintiff asserts the following claims:

> Count I: Wrongful Termination;
>
> Count II: Workplace Discrimination Due to an On-the-Job Injury;
>
> Count III: Violation of the Americans with Disabilities Act ("ADA").

On April 18, 2012, Defendant UBS filed its Motion for Summary Judgment.  Plaintiff filed her own Motion for Partial Summary Judgment on May 11, 2012.  In addition to these cross motions for summary judgment, Defendant filed a Motion to Exclude the Testimony of Mary T. Cooley (doc. 36) on April 17, 2012, and Plaintiff filed a Motion to Exclude Testimony of Defendant's Proposed Expert Merl Miller (doc. 46) on May 4, 2012.

## II.   Undisputed Material Facts

Ordinarily, when reviewing a motion for summary judgment, a court views the facts in the light most favorable to the non-moving party.  *See Trask v. Franco*, 446 F.3d 1036, 1043 (10th Cir. 2006).  In this case, the Court is faced with cross motions for summary judgment. Because Defendant prevails on both motions based upon undisputed facts, for efficiency's sake the Court will view all of the facts in the light most favorable to Plaintiff for purposes of both motions for summary judgment, and will set forth a summary of the facts accordingly, making all permissible inferences in favor of Plaintiff.

Plaintiff was hired by UBS on September 15, 2008, as a donor care specialist.  Plaintiff had approximately seventeen years of prior experience as a clinical lab assistant and phlebotomist.  Plaintiff was an "at will" employee.  At the outset of her employment Plaintiff was trained for her new position, satisfied all required competency tests, and began work at UBS as a donor care specialist.  During this initial period of employment, Plaintiff conducted over

three hundred donor interviews.

The primary purpose of the donor-care-specialist position is three-fold: to conduct donor interviews in order to ensure that potential donors' blood is acceptable for donation; to draw the blood; and properly to maintain blood donor records.  All of these functions are important, but the initial interview process in particular is of extreme importance because the failure to properly screen donors could result in the spread of blood-born disease.  Therefore the interview procedure is an essential function of the donor-care-specialist position.

In the performance of these primary purposes of the position, a donor care specialist's essential job functions include setting up and maintaining donor interviewing and blood-drawing areas, cleaning these areas and equipment, and restocking supplies.  These functions require filling and lifting coolers, and moving machines, which activities involve significant bending, stooping, squatting, and lifting.  All donor care specialists are required to perform these actions.

On December 24, 2008, Plaintiff injured her knee while squatting down to assist a donor.  Plaintiff underwent surgery for a torn meniscus, and was off work until February 2009.  Upon returning to work, Plaintiff worked for only three days before undergoing another meniscus surgery and being off work until August 10, 2009.

Upon her initial return to UBS in August, Plaintiff was restricted by her physician to sedentary work for four hours per day, and UBS permitted Plaintiff to work in its call center in order to accommodate these restrictions.  Plaintiff's physician relaxed Plaintiff's medical restrictions by stages, and he released her from all physical restrictions on September 28, 2009.

During the nine-odd months of Plaintiff's absence, UBS changed its procedures from a paper-based system to a computer-based system.  In particular, UBS changed from using paper copies of its Standard Operating Procedures ("SOPs") to using computer-based SOPs.  As a

result of these changes, UBS decided to retrain Plaintiff in order to ensure that she was capable of utilizing the new system. Plaintiff agreed that such training was appropriate. Accordingly, Plaintiff was placed in the training pipeline with several brand new employees, and given the complete training used for new hires.

The training proved difficult for Plaintiff. She had trouble accessing and using the computer-based SOPs and felt that "things [were] different with the computer." (Doc. 40-3 at 3, Plaintiff's Planner, entry for September 15, 2009.) Plaintiff requested extra training time outside of the ordinary schedule from UBS trainer Melanie Michalski, but her request was denied because overtime pay—which would have been required—was not authorized for training purposes. However, Ms. Michalski did provide Plaintiff with materials to take home for extra study. Additionally, Plaintiff requested one-on-one training, but cannot remember whether she ever received such training.

Plaintiff felt uncomfortable in the training class because she felt she was being treated unfairly, and felt that she was under a significant amount of pressure. Plaintiff had difficulties with the aspect of the training that involved numerous mock interviews using the computer. She felt overwhelmed by the information she was being given, that she could not seem to "get" the computer interview training, and she said that she would get a mental block in front of the computer. She also felt that the serious atmosphere in the training was uncomfortable, and that she was being singled out among the trainees. Plaintiff was sent on several occasions to observe others conducting donor interviews. While Plaintiff found these observations helpful when she was first hired at UBS, she did not feel that they were helpful during her retraining, despite her difficulties with conducting donor interviews herself.

As a result of all these difficulties, Plaintiff met in mid-September with UBS's Human

Resources Director, Monica Walters, to inquire about the possibility of transferring to another position.  Ms. Walters informed Plaintiff that there were no other current openings at UBS, but explained to Plaintiff how to access UBS's job postings for new job openings.   No new openings became available, and in fact two weeks after Plaintiff's discharge UBS was forced to layoff approximately a dozen staff members.

Several days after speaking with Ms. Walters, Plaintiff spoke with Ms. Michalski about the possibility of additional training.  During the course of the conversation, Ms. Michalski suggested that Plaintiff inquire into returning to her previous employer, TriCore.  Ms. Michalski had apparently heard from a human resources officer at TriCore that jobs were available, and she suggested that Plaintiff could find a job she was better able to perform.  Plaintiff stated that she did not want to go back to TriCore, but instead wanted to remain in her job at UBS.

The training class culminated in interview competency tests, which tested the trainee's ability to conduct a simulated donor interview.  Plaintiff knew that passing the interview competency test was required for her to return to her old position as donor care specialist, and Plaintiff agrees that without demonstrating competency in the interview process by passing the test, she should not have been allowed to conduct actual interviews.

The interview competency test for Plaintiff's training class was administered by Ms. Michalski.  Plaintiff's test took place on September 23, 2009.  Each trainee was tested separately and given the same scenario: Ms. Michalski acted as a potential donor and the trainees were to conduct the standard interview process.  Plaintiff was the only one of the trainees who was unable to complete the test satisfactorily.  The following week, after additional training including observing other employees conduct donor interviews, Plaintiff again failed the interview competency test given to her on September 29, 2009.  During that second test, Plaintiff had

5

significant difficulties conducting the interview: she processed the donor for an incorrect type of donation, incorrectly asked questions about diseases, and failed to ask questions about antibiotic use.

After failing her first two attempts at the interview competency tests, Plaintiff was told by UBS Director Rose Marie Keating that she would be given until October 2, 2009, to pass the test. She was also told that she would be allowed to use a hard copy of the SOPs for the test, because of her difficulties using the computer-based SOPs. On Friday, October 2, 2009, Ms. Michalski administered Plaintiff's final interview competency test, during which Plaintiff used a hard copy of the SOPs. Plaintiff was not able to satisfactorily complete the test. Plaintiff asserts that Ms. Michalski was not giving Plaintiff her full attention during this test, but did not communicate this concern to Ms. Michalski or anyone else.

The following Tuesday, October 6, 2009, Plaintiff met with Ms. Keating and Ms. Walters and received her termination letter, which stated that she was being discharged due to her inability to perform the donor interview.

During the course of her training at UBS in September of 2009, Plaintiff describes feeling as though she was being treated differently from other trainees. She states that she felt there was a lack of support for her, that she would come in in the morning and not be acknowledged, and that she was laughed at when unable to pronounce certain words, such as medical terms. Nevertheless, Plaintiff acknowledges that no one at UBS made critical or inappropriate comments about Plaintiff's injury or disability, that no one at UBS indicated that they considered Plaintiff to be disabled or questioned her injury, and that no UBS employees ever made any disparaging comments about disabled people.

During September of 2009, Plaintiff was prescribed a palliative medication called

6

Tramadol, to be taken as needed to lessen the pain in her knee.  Plaintiff states that she took Tramadol once or twice a week in September, but ceased taking it by October of 2009.  Plaintiff also states that she does not recall any side-effects of the drug, nor that it ever made it difficult for her to think clearly.  At one point she mentioned to UBS that her problems in the training could have resulted from the medication, but when Ms. Michalski later asked whether the medication could be affecting her thinking, Plaintiff stated that it was not.  Plaintiff also admitted in her deposition that the drug did not make her thinking foggy.  Plaintiff asserts that she has no mental or learning disability, nor did she ever have one during the course of her employment with UBS.

Several months after Plaintiff was terminated, in April of 2010, Plaintiff underwent a Functional Capacity Evaluation ("FCE").  The results of the FCE showed that Plaintiff is "unable to perform squatting, stooping, kneeling, or crawling activities" and that Plaintiff is best suited to sedentary work that requires only occasional lifting of up to ten pounds.  Plaintiff admits that the FCE accurately represents her physical capabilities as they were in September and October of 2009 and since.  Plaintiff also admits that she would not have been able to perform all of the duties of a donor care specialist, in particular filling and lifting coolers or moving the apheresis machines, all of which require lifting, bending, stooping, or squatting.  Plaintiff's only allegations of disability relate to her knee condition; she does not allege that she has any mental or cognitive disabilities.

### III.     Factual Disputes

In her response to Defendant's motion, Plaintiff appears to attempt to dispute almost the entirety of Defendant's proffered material facts.  Fed. R. Civ. P. 56(c)(1) states that:

A party asserting that a fact cannot be or is genuinely disputed must support the

assertion by:

(A) citing to particular parts of materials in the record, including depositions or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Against this standard, Plaintiff's attempts to dispute Defendant's material facts almost uniformly fail. Plaintiff makes legal arguments relating to the facts, rather than offering any contrary citations to evidentiary materials. Therefore, Defendant's proffered uncontested material facts are largely accepted by the Court as uncontested.

Plaintiff's own statements of facts, however, in either her response to Defendant's Motion for Summary Judgment or Plaintiff's own Motion for Partial Summary Judgment, are not as successful. Plaintiff's asserted facts are frequently mis-readings of the supporting evidence, as for instance, fact number 34 in Plaintiff's motion for summary judgment, which reads: "Ms. Tavarez believes the ingestion of Tramadol may have made her 'thinking . . . foggy.'" Plaintiff cites for this proposition to Plaintiff's deposition, page forty-one, lines fifteen to nineteen. Those lines, with the inclusion of line 20, read as follows:

```
15      A.  I said, "It could be, because I'm taking that
16   pain med, that maybe it does at times make you foggy or
17   could make you foggy," but I wasn't for certain on that.
18      Q.  Did you think at the time that it was making you
19   foggy, your thinking?
20   No. It was nothing like that for me.
```

(Doc. 49-2 at 6.) Accordingly, in its task of taking all the evidence in the light most favorable to Plaintiff, the Court does not necessarily rely on Plaintiff's factual assertions, to the extent that they are unsupported by the evidence. The Court has found Defendant's various responses to

Plaintiff's factual representations helpful, and finds them to be largely accurate criticisms of Plaintiff's proffer.

## LEGAL STANDARD

Summary judgment is only appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(c); *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. Once that burden is met, the nonmoving party must put forth specific facts showing that there is a genuine issue of material fact for trial; it may not rest on mere allegations or denials in its own pleadings. *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986). In order to avoid summary judgment, the non-moving party must put forth enough evidence that a reasonable jury could return a verdict in the non-movant's favor. *Id.* at 249. A mere scintilla of evidence in the non-movant's favor is not sufficient. *Id.* at 252. Analysis of a summary judgment motion requires that the court consider all the evidence in the light most favorable to the nonmoving party. *Trask v. Franco*, 446 F.3d 1036, 1043 (10th Cir. 2006).

When parties file cross-motions for summary judgment in which they both allege the absence of disputed material facts, it is proper for the Court to consider and rule on the legal issues presented. In such a case, the Court should award summary judgment to the party which is entitled to judgment as a matter of law in light of the undisputed facts. *O'Connor v. Check Rite, LTD*, 973 F.Supp. 1010 (D. Colo. 1997); *Spring Spectrm. L.P. v. Board of County Commissioners of Jefferson County, Colo.*, 59 F.Supp. 2d 1101 (D. Colo. 1999); *Schmidt v. Farm Credit Svs.*, 977 F.2d 511 (10th Cir. 1992).

**DISCUSSION**

Plaintiff, in her response to Defendant's motion, makes no defense of her state-law Wrongful Termination claim, but instead contests Defendant's motion only as to her claims under the ADA.[1] After reviewing the undisputed facts, the Court agrees that Defendants have established a basis for summary judgment as to Plaintiff's state law claims. According to the evidence provided by Defendants, which Plaintiff does not controvert, Plaintiff was an at-will employee, and thus her termination violated no employment contract she had with UBS. Plaintiff has neither alleged nor given any evidence that she engaged in a protected activity, that UBS had knowledge of that protected activity, or that there was a causal connection between the protected activity and Plaintiff's termination. These being the chief elements of a claim of retaliatory discharge, *see Weidler v. Big J Enters., Inc.*, 953 P.2d 1089 (1998), Plaintiff's claim is subject to summary judgment.

Accordingly, the Court will address at length only Plaintiff's claims under the ADA. Plaintiff asserts two claims under the ADA: Count II: Workplace Discrimination Due to an On-the-Job Injury; and Count III: Violation of the Americans with Disabilities Act. Count II does not specify the legal basis for its claim; however, throughout argument the parties treat this count as though it falls under the ADA, and the Court will so construe it. That being the case, since both Count II and Count III allege violations of the ADA, the Court believes Plaintiff's claims can best be described as a claim of discrimination under the ADA and a claim for failure to accommodate Plaintiff pursuant to the requirements of the ADA. These two claims involve

---

[1] Because Plaintiff has made no contrary argument, Plaintiff has waived appellate review of the Court's determination. *See BioDiversity Conservation Alliance v. Bureau of Land Mgt.*, 608 F.3d 709, 714 (10th Cir. 2010) ("[A] litigant who does not argue an issue in the district court may not seek appellate relief.").

different factual claims and different legal standards, and therefore the Court will treat them as discrete claims.

## I.      Applicability of the ADA

As a matter preliminary to either of Plaintiff's factual theories, she must establish that the ADA applies to her.  However, there appears to be some confusion as to what exact disability Plaintiff is claiming to have.  Plaintiff has an injured knee, and according to an FCE from 2010 she is now functionally disabled in that her physical capabilities are restricted from squatting, stooping, kneeling, or crawling activities, and to sedentary duty, with occasional lifting of ten pounds or less.  Nevertheless, Plaintiff does not claim, and indeed disputes (in argument, although as it turns out not in her sworn deposition), that she had or would have had any physical difficulties in performing her work at UBS.  However, Plaintiff also denies that she has any mental, cognitive, or learning disabilities.  Nevertheless, Plaintiff's claims revolve around difficulties she was having in understanding training on the new computer-centric method for conducting interviews.  Thus, it appears that Plaintiff is claiming to have a quasi-mental disability: she was injured on the job, and as a result of her injury took medication that caused her to have difficulty during the computer training given by UBS.

The ADA contains a standard for determining disability for purposes of its requirements, and that standard involves a burden for Plaintiff to satisfy.  There are three elements that a plaintiff must establish under 42 U.S.C. § 12102(1)(A) regarding any alleged disability: "[f]irst, the plaintiff must have a recognized impairment; second, the plaintiff must identify one or more appropriate major life activities; and third, the plaintiff must show that the impairment substantially limits one or more of those activities." *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003).  Indeed, plaintiffs must "articulate with precision the

impairment alleged and the major life activity affected by that impairment, and the court is to analyze only those activities identified by the plaintiff." *Id.* "Articulate with precision" is a requirement that leaves little room for doubt, and the Court cannot find any discussion in Plaintiff's submissions relating to major life activities. Accordingly, the Court concludes that Plaintiff has not established that she is disabled, and thus that the protections of the ADA apply to her. This alone would be sufficient grounds to grant summary judgment to Defendants.

     A further impediment to Plaintiff's claims arises as to her assertions that the side effects of Tramadol qualify as a disability under the ADA. First, Plaintiff, in a sworn deposition, admitted that she experienced no side effects of the drug that affected her thinking. Second, even had there been side effects, Plaintiff has not established that those side effects would qualify as a disability. In general, "[a] nonpermanent or temporary condition cannot be a substantial impairment under the ADA." *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 185 (3rd Cir. 2010). Plaintiff does not claim that any side effects from her pain medication were a permanent condition, and indeed she ceased to take the drug after September 2009. Side effects of medications may qualify as a disability under the ADA, but only if the medication is required by a licensed medical professional and there is no "available alternative that is equally efficacious that lacks similarly disabling side effects." *Id.* The fact that Plaintiff discontinued use of Tramadol shows that it was not required, *see id.*, and Plaintiff additionally makes no showing that she ever even discussed the possibility of an alternative pain medication with her physician. Accordingly, any side effects that Tramadol might have had on Plaintiff do not qualify as a disability under the ADA.

     Plaintiff has failed her burden to demonstrate that she had any disability that would form a basis for application of the ADA, which is a sufficient basis to grant summary judgment to

Defendant. Nevertheless, the Court will continue to a brief discussion of the merits of Plaintiff's claims in the interests of thoroughness.

## II.     Failure to Provide Reasonable Accommodation

Under the ADA, an employer must make a reasonable accommodation "to the known physical or mental limitations of an otherwise qualified individual employee." 42 U.S.C. § 12112(b)(5)(A). "[E]mployees must come forward with the information about the things they seek to be accommodated on." *Tesh v. U.S. Postal Service*, 349 F.3d 1270, 1276 (10th Cir. 2003). Plaintiff provides no evidence that she informed UBS of any disability which would require accommodation. When her physician released her to full duty, he apparently did so without qualification or notation of any continuing physical impediments. Nothing in such a full release would alert UBS to any continuing physical disabilities to which Plaintiff would be subject. Plaintiff did inform UBS as to the *possibility* that her pain medication could be interfering with her training, but at no point did Plaintiff provide UBS with information that would justify treating such potential side effects as a disability. Plaintiff also testified in her deposition that when Ms. Michalski asked Plaintiff whether her medication was making her thinking foggy, Plaintiff told Ms. Michalski that it was not.[2]

Accordingly, as Plaintiff did not inform UBS of any disabilities requiring accommodation, her claim for failure to accommodate under the ADA must fail, and Defendants

---

[2] Even though Plaintiff did not inform UBS as to any disability that required accommodation, the Court notes that UBS did provide Plaintiff with ample help in order to return to her former position at UBS. Defendant allowed Plaintiff to work in its call center in order to conform to Plaintiff's initial medical restrictions; Defendant then provided Plaintiff with several weeks of retraining; when Plaintiff failed the initial interview competency test, UBS provided her with two additional weeks of training, two additional attempts at the test, and materials for Plaintiff to use for additional study. UBS provided Plaintiff with a week during which to discuss a change in medication with her doctor, and offered Plaintiff a thirty-day unpaid period of leave during which time Plaintiff could have sought a solution to any medicinal side effects or any other barriers to understanding the training material and passing the interview competency test.

shall be accorded summary judgment on this claim.

## III.   Discrimination Under the ADA

A prima facie case of discrimination under the ADA involves a showing by a plaintiff that "(1) she is disabled as defined by the ADA; (2) that she is qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) she suffered discrimination on the basis of her disability." *Hennagir v. Utah Dep't of Corrections*, 587 F.3d 1255, 1261 (10th Cir. 2009).

The Court has already discussed Plaintiff's failure to establish that she is disabled as defined by the ADA. Plaintiff has also failed to show that she is qualified to perform the essential functions of the donor care specialist job.

Plaintiff herself admits that she cannot do some of the tasks required of donor care specialists, such as loading and moving the coolers and dealing with the apharesis machines. She admits that these are functions performed by all donor care specialists, and she does not argue that any reasonable accommodation could be given her that would allow her to perform these functions. Additionally, a comparison of the results of Plaintiff's FCE—which Plaintiff states accurately reflects her physical capabilities in September and October of 2009—with the description of the requirements of the donor care specialist position show that Plaintiff's limitations would preclude her from many aspects of the job, including some of the essential functions of the job.

Plaintiff argues strenuously that the information provided on this matter by Defendant's proposed witness Merl Miller should be excluded. Plaintiff argues that Mr. Miller's testimony is de facto expert testimony, and that therefore Defendant has violated the discovery rules regarding disclosure of experts. The Court is not persuaded by Plaintiff's argument, as Mr.

Miller's testimony fits within Fed. R. Evid. 702 as an opinion offered by a lay witness. Essentially, Mr. Miller's testimony is a summary of the analysis he conducted with regard to the physical activities involved in the position of donor care specialist. In other words, Mr. Miller provides a summary of his observations regarding the actions commonly performed by donor care specialists during the course of their daily activities, and Defendant offers the testimony as a series of facts about the position. Accordingly, Plaintiff's Motion to Exclude Testimony of Defendant's Proposed Expert Merl Miller (doc. 46) is denied.

Nevertheless, the Court's ruling on this matter does not have dispositive force, because while Mr. Miller's assessment provides additional detail to the requirements of the donor-care-specialist position, Plaintiff herself admits that she is and was not physically capable of performing some of the tasks of the position in September and October of 2009. *See* Pltf. Depo. p. 20 ln. 1–9 and p. 21 ln. 6–11. Therefore, while Mr. Miller's assessment is informative, it is not essential to a finding that Plaintiff cannot perform the physical requirements of the position.

Therefore the Court concludes that Plaintiff has failed to establish the second prong of the prima facie case, that she is qualified to perform the essential functions of the donor care specialist position.

As to the third prong, in order to make a prima facie showing that she was terminated because of a disability, Plaintiff "must present some affirmative evidence that disability was a determining factor in the employer's decision." *Selenke v. Med. Imaging*, 248 F.3d 1249, 1259 (10th Cir. 2001) (internal quotation marks and citation omitted). "ADA cases without direct evidence of discrimination generally are evaluated under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Butler v. City of Prairie Village, Kan.*, 172 F.3d 736, 747 (10th Cir. 1999).

> Under McDonnell Douglas, the plaintiff bears the initial burden of establishing a prima facie case by a preponderance of the evidence. Once the plaintiff has established a prima facie case, a rebuttable presumption of unlawful discrimination arises. The defendant then bears the burden of producing a legitimate, nondiscriminatory reason for the adverse employment decision. If the defendant is able to articulate a valid reason, the plaintiff has the opportunity to prove that the defendant's stated reason "was in fact pretext." At all times, the plaintiff bears the ultimate burden of proving discrimination.

*Id.* at 747–48 (internal quotations and citations omitted).

Plaintiff argues that the swiftness of Plaintiff's termination, and Defendant's unwillingness to acquiesce to Plaintiff's request for extra training outside of normal working hours, create an inference of discrimination. The Court disagrees. Taken in the light most favorable to Plaintiff, the allegations Plaintiff makes of mistreatment—such as that she was treated coldly and placed under significant pressure during her re-training period—have no factual connection to any disability Plaintiff may have had. The ADA does not forbid personal animus, hostility, coldness, or pressure in the workplace; it forbids discrimination based on disability. Without some factual evidence that would connect any alleged mistreatment to a disability, such treatment is irrelevant to any claim under the ADA. Plaintiff does not allege that anyone at UBS made critical or inappropriate comments about Plaintiff's injury or disability or ever made any disparaging comments about disabled people; in fact, Plaintiff does not allege that anyone at UBS ever indicated that they even considered Plaintiff to be disabled or ever questioned her injury or abilities.

As to the report of Plaintiff's expert Ms. Cooley, Ms. Cooley relies on Plaintiff's performance evaluations which state that Plaintiff's performance is satisfactory up until the day before Plaintiff's termination, and states her confusion as to how Plaintiff could have been performing satisfactorily up to the day before her termination. *See* doc. 36, ex. 1, p. 2 ("Ms.

Tavarez's Training and Competency Records dated 9.25.09, one week prior to termination, indicate that she was 'competent' in virtually all areas. As late as 10.5.09, the day before she was terminated, she was working at a 'competent' level. Barring some egregious behavior, how does one go from competent to terminated in the span of 24 hours?"). The Court is not convinced. Whatever the "competent" marking on Plaintiff's performance evaluations might have meant, Plaintiff does not dispute that she had difficulty in absorbing the training materials, and failed three successive attempts over the course of two weeks to demonstrate competency at completing a donor interview, which competency is required of a donor care specialist. Therefore, her termination is not the termination out of thin air that Plaintiff's expert appears to believe it is. Nothing else in Ms. Cooley's report throws additional light onto the facts which would act to satisfy Plaintiff's burden to establish an inference of discrimination.

Accordingly, the Court considers Plaintiff to have failed to make her required showing of discriminatory motivation behind her termination, and thus Plaintiff does not make out a prima facie case of discrimination.

Even had Plaintiff made a prima facie showing of discrimination, Defendant provides a non-discriminatory reason for her termination: Plaintiff failed the interview competency test, after being given approximately five weeks of training and three attempts to pass it. Plaintiff herself admits that she should not have been allowed to resume her donor care specialist position without having been able to show competency in conducting donor interviews. Therefore Defendant has satisfied its burden under the *McDonnell Douglas* burden-shifting framework, and the burden shifts back to Plaintiff to show that Defendant's proffered reason is a pretext. Plaintiff does not even attempt to do so. Plaintiff's arguments revolve around supposed inadequacies in the training, not around whether an inability to pass the competency test is a

pretext for a discriminatory termination. Therefore, even had Plaintiff made out a prima facie case of discrimination, she would have been unable to rebut Defendant's proffered non-discriminatory reason for termination.

Accordingly, Plaintiff has not established a sufficient factual basis in support of her claims for discriminatory termination under the ADA for those claims to survive summary judgment, and Defendant's Motion for Summary Judgment is granted.

## CONCLUSION

Plaintiff has failed both to provide sufficient factual support to be accorded summary judgment herself, but additionally has failed to identify disputes of material fact that would preclude Defendant from being granted summary judgment. Therefore, for the foregoing reasons, the Court makes the following rulings:

- Defendant's Motion for Summary Judgement (**doc. 40**), filed April 18, 2012, is **GRANTED**;

- Plaintiff's Motion for Partial Summary Judgment as to Liability (**doc. 49**), filed May 11, 2012, is **DENIED**;

- Defendant's Motion to Exclude the Testimony of Mary T. Cooley (**doc. 36**), filed April 17, 2012, is **DENIED**;

- Plaintiff's Motion to Exclude Testimony of Defendant's Proposed Expert Merl Miller (**doc. 46**), filed May 4, 2012, is **DENIED**.

The granting of Defendant's Motion for Summary Judgment disposes of all the claims in this case in favor of Defendant. Accordingly, a Rule 58 Judgment shall issue.

**SO ORDERED**.

_____
UNITED STATES DISTRICT JUDGE